KRISTOPHER CREEL,

        Plaintiff,

v.                                     Case No. 2:14-cv-10648

CORPORAL ANDREW HUDSON, in his individual capacity,
SERGEANT MICHAEL BLAGG, in his individual capacity,
SERGEANT SHAWN RAMSEY, in his individual capacity,
CORPORAL BRIAN FERNANDEZ, in his individual capacity,
LIEUTENANT DARYL SIMPSON, in his individual capacity,
WARDEN DAVID BALLARD and COMMISSIONER JIM RUBENSTEIN,
each in their individual and official capacities,

        Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court are the parties' cross-Motions for Summary Judgment (ECF Nos. 56 and 60).

## RELEVANT PROCEDURAL HISTORY

On February 19, 2014, the plaintiff filed the instant Complaint under 42 U.S.C. § 1983, alleging that the defendants violated his rights under the Eighth and Fourteenth Amendments of the United States Constitution. The plaintiff's claims arise out of three separate instances where force was used against him by correctional officers at the Mount Olive Correctional Complex ("MOCC").

First, the plaintiff claims that, on May 6, 2013, he was told to give up all of his personal property because he was being placed on the Behavior Management Plan. The plaintiff alleges that he attempted to comply, but asked if he could keep his religious materials/Bible. When he was told that he could not keep those materials, he refused to give up his property. The plaintiff further alleges that defendant Simpson opened his food slot and repeatedly shot him with a high powered pepperball gun (he claims that he was shot in excess of 15-20 times).[1] He further contends that he was also "maced with a chemical agent." (*Id.* at 9).

The plaintiff further alleges that he was removed from his cell and all of his property was taken except for the boxer shorts he was wearing. He further alleges that, although he was taken to the recreation yard for decontamination and treatment, his cell was not properly decontaminated. The plaintiff further contends that he was written up for refusing an order, but that charge was later dismissed, and that he was placed on the Behavior Management Plan and spent a week with no mat, hygiene items, toilet paper, sheets, blankets or clothes. (*Id.* at 10).

## June 7, 2013 incident

The plaintiff also alleges that, on June 7, 2013, defendants Blagg and Hudson arrived at his cell and demanded that he cuff up and come out of his cell for a haircut. The plaintiff stated that he did not need a haircut because he had just had his head shaved a week before. (*Id.* at 10). The plaintiff further alleges that Hudson immediately shot a

---

[1] During his deposition, the plaintiff acknowledged that the video evidence and other evidence of record demonstrates that it was defendant Penick, not Simpson, who deployed the pepperball gun.

high powered pepperball gun into his cell in excess of 30-35 times, and that he was also sprayed with a chemical agent. (*Id.*) The plaintiff further alleges that he was extracted from his cell and was forced to get a haircut, despite still having pepper spray in his eyes and his skin still burning. (*Id.*) The plaintiff further alleges that these defendants laughed at him and told him to "suck it up" and "stop being a pussy." (*Id.* at 11). The plaintiff again alleges that neither he, nor his cell, were properly decontaminated. (*Id.*)

The plaintiff alleges that he had "30 plus" red marks and bruises over his body, including his face, neck and head. The plaintiff contends that his repeated requests for medical attention and pictures of his injuries were denied. (*Id.*) The plaintiff further states that he was written up for refusing an order, without any mention of the force used against him. He further contends that the defendants failed to comply with the written use of force policies, "essentially ignoring them all together," and "substituting policies and procedures with the Warden's go ahead and implementation of Marshal [sic; martial] Law." (*Id.*)

<u>September 26, 2013 incident</u>

The plaintiff further alleges that on September 26, 2013, he was awakened by defendant Blagg and told to strip out and cuff up. The plaintiff contends that he complied with those demands, but, as he was being cuffed so that they could remove him for a cell search, Blagg, without provocation, squeezed the plaintiff's hands together "causing pain for no reason other than to provoke and hurt the plaintiff." (*Id.*) The plaintiff asked Blagg why he was doing that and Blagg allegedly stated that he was "tired of his shit." (*Id.*)

The plaintiff was then taken from his cell by defendants Blagg and Fernandez to a shower so that his cell could be searched. The plaintiff contends that he was compliant with all of their orders. However, the plaintiff contends that these defendants pushed and shoved him forward and forced him to walk faster than he was able, and that Blagg became angry and said "shut the f#ck up and you will walk as fast as we tell you to walk." (*Id.* at 12). The plaintiff contends that this was done in an effort to provoke him into resisting. (*Id.*)

As they approached the shower door, the plaintiff contends that Blagg said, "you better not stiffen up on me boy, or I will face plant you." (*Id.*) The plaintiff alleges that he shouldered up to the shower door, as required, while Blagg and Fernandez were shouting obscenities at him. The plaintiff alleges that, although inmates are usually placed in the shower in full restraints, Blagg and Fernandez attempted to remove his leg shackles before placing him in the shower. (*Id.*) He further alleges that Fernandez placed his body weight against the plaintiff's shoulder, as Blagg told him to put his feet out farther from the wall until he was about to fall over. (*Id.*)

The plaintiff then alleges that Blagg grabbed him by the back of his neck and jerked the plaintiff away from the wall and slammed him face first into the shower floor and then jumped on top of him and began striking him in the face, head and body. (*Id.* at 12). The plaintiff was then jerked back to his feet and Blagg allegedly stated "he didn't seem so tough now, did he?" (*Id.*) The plaintiff has provided the declarations of several other inmates who witnessed this conduct that support his allegations. (*Id.* at 11 and Exs. 7, 8 and 9).

The plaintiff alleges that this conduct violated the West Virginia Division of Corrections' use of force policies and that he posed no threat and was not resisting, but was trying to comply with all orders. (*Id.*) The plaintiff states that he was subsequently taken to the multi-purpose room for treatment and pictures were taken of his injuries. The plaintiff states that he suffered a large laceration above his eyebrow and swelling to his face and head. (*Id.*) The plaintiff further alleges that he was then taken back to the shower. (*Id.*) The plaintiff was again placed on BMP and his property was taken. (*Id.*) He was also written up for refusing an order and assault. (*Id.* at 13).

Count One of the Complaint addresses the use of force on May 6, 2013. Count Two of the Complaint addresses the use of force on June 7, 2013. Count Three of the Complaint addresses the use of force on September 26, 2013. Count Four of the Complaint, which is brought only against defendants Ballard and Rubenstein, alleges that "on multiple occasions" (which are not specified), the plaintiff was placed on BMP and had all of his property taken from him without any hearing, explanation or write up. He contends that such conduct violated his due process rights. Finally, Count Five of the Complaint, which is also brought only against Ballard and Rubenstein, alleges claims of supervisory liability.

On March 28, 2016, following a period for discovery, the defendants filed a Motion for Summary Judgment, with exhibits (ECF No. 56), and a Memorandum of Law in support thereof (ECF No. 57). The defendants' exhibits consist of the following: (A) the Use of Force Committee Report and incident reports concerning the May 6, 2013 use of force against the plaintiff; (B) the Use of Force Committee Report and incident reports concerning the June 7, 2013 use of force against the plaintiff; (C) the Use of Force

Committee Report and incident reports concerning the September 26, 2013 use of force against the plaintiff; (D) the MOCC Inmate Handbook; (E) the plaintiff's acknowledgement of receipt of the Inmate Handbook; (F) an Affidavit of Lisa Frye; (G) Volume I of the plaintiff's deposition transcript; (H) Volume II of the plaintiff's deposition transcript; and (I) a copy of an opinion in *Lewis v. White*. (ECF No. 56-1, Exs. A-I).[2] The defendants' Motion and Memorandum assert that they are entitled to judgment as a matter of law because: (1) the plaintiff did not timely exhaust the required administrative remedies concerning the May 6, 2013 and June 7, 2013 incidents; (2) the plaintiff has failed to demonstrate that the force used against him on any of the three occasions was not used in a good faith effort to restore order; and (3) the plaintiff cannot sufficiently establish his claims of supervisory liability against defendants Ballard and Rubenstein.

Pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised several times of his right and obligation to respond to any motion for summary judgment filed by the defendants. (ECF Nos. 31 and 59). On January 20, 2017, the plaintiff filed what has been construed as his own Motion for Summary Judgment and Response to the defendants' Motion for Summary Judgment (ECF No. 60), with the following exhibits: (1) the plaintiff's Intensive Supervision Log from May 6, 2013; (2) incident reports concerning the May 6, 2013 incident prepared by Sergeant Shawn Ramsey; (3) a memorandum to Major Robert Rhodes from Lieutenant Darryl Simpson summarizing the May 6, 2013 incident; (4) an incident report concerning the May 6, 2013

---

2  The defendants were subsequently directed to produce copies of three videos that were recorded during or subsequent to the three incidents that are the subject of the plaintiff's Complaint. (ECF No. 71). The undersigned will discuss these videos as necessary *infra*.

incident prepared by Corporal Andrew Hudson; (5) an excerpt (page 2 of 3) from the Use of Force Committee Report concerning the May 6, 2013; (6) an outline of the Behavior Management Plan; (7a) an incident report concerning the May 6, 2013 incident prepared by COII Patrick Galapon; (7b) an incident report concerning the May 6, 2013 incident prepared by COII Kevin Morton; (7c) an incident report concerning the May 6, 2013 incident prepared by Sergeant Joe Hill, Jr.; (7d) an incident report concerning the May 6, 2013 incident prepared by Corporal Randy Gilkerson; (7e) an incident report concerning the May 6, 2013 incident prepared by COI Joseph Barbagallo; (7f) an incident report concerning the May 6, 2013 incident prepared by Sergeant Brian Penick; (7g) an incident report concerning the May 6, 2013 incident prepared by Lieutenant Margaret Clifford; (7h) an incident report concerning the May 6, 2013 incident prepared by COII David Miller; (7i) an incident report concerning the May 6, 2013 incident prepared by LPN Kelly Foster; (8) an excerpt (page 2 of 3) from the Use of Force Committee Report concerning the June 7, 2013 incident; (9) Policy Directive 334.01 concerning Inmate Grooming Standards; (10) a memorandum to Major Robert Rhodes from Lieutenant Nate Kendrick summarizing the June 7, 2013 incident; (11) an incident report concerning the June 7, 2013 incident prepared by Sergeant David Miller; (12) incident reports concerning the June 7, 2013 incident prepared by Corporal Andrew Hudson; (13) product overview sheet concerning SABRE Red MK-9 Cell Buster with Hose and Wand Attachment; (14) a Declaration of Steven J. Taylor concerning June 7, 2013 incident; (15) the Use of Force Committee Report concerning September 26, 2013 incident; (16a) an incident report concerning the September 26, 2013 incident prepared by Sergeant Joe Hill, Jr.; (16b) incident reports concerning the September 26, 2013 incident prepared by Sergeant David

Miller; (16c) an incident report concerning the September 26, 2013 incident prepared by COII Patrick Galapon; (17) a memorandum to Major Robert Rhodes from Lieutenant Warren Dempsey summarizing the September 26, 2013 incident; (18a) an incident report concerning the September 26, 2013 incident prepared by Sergeant Michael Blagg; (18b) an incident report concerning the September 26, 2013 incident prepared by Corporal Brian Fernandez; (19) a witness summary of the September 26, 2013 incident prepared by inmate Steven Walker; (20) a Declaration of inmate Andre Wilson concerning the September 26, 2013 incident; (21) a Declaration of inmate Lawrence Stuckey concerning the September 26, 2013 incident; and (22) a photograph purported to demonstrate injuries sustained by the plaintiff during the September 26, 2013 incident. (ECF No. 60-1). On March 23, 2017, the defendants filed a Reply brief (ECF No. 65). On July 3, 2017, the court was provided and docketed the plaintiff's Reply brief (to his own Motion for Summary Judgment), which was apparently received by defense counsel on or about May 7, 2017, but was not mailed to the court for filing.[3] (ECF No. 68). This matter is ripe for adjudication.

## STANDARD OF REVIEW

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled

---

[3] With respect to both the plaintiff's Motion/Response (ECF No. 60) and his Reply (ECF No. 68), the plaintiff failed to mail copies of those documents to the Clerk for filing. The plaintiff is admonished that, in addition to serving a copy upon defense counsel, he is required to mail all filings to the court for docketing.

to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Kentucky Cent. Life Ins.* Co., 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may: (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment

if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order.   Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence or make determinations of credibility.   *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).   Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.   *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).   Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."   *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).   However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.   *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## ANALYSIS

### A.   Failure to exhaust administrative remedies.

The defendants contend that they are entitled to summary judgment with respect to the plaintiff's claims concerning the incidents on May 6, 2013 and June 7, 2013, because the plaintiff failed to timely file grievances concerning either incident and, thus, he failed to properly exhaust the required administrative remedies.   In support of this contention, the defendants have offered an affidavit completed by Lisa Frye, Office Assistant III, who states that she processes all grievances submitted by inmates in the Quilliams II unit at MOCC.   (ECF No. 56, Ex. F).   Ms. Frye's affidavit states that there is no record of any grievances being filed by the plaintiff concerning these incidents during the time period

10

required by the grievance policy.   (*Id.*)

Section 1997e(a) of the Prison Litigation Reform Act of 1995 ("the PLRA"), 42 U.S.C. § 1997e(a), states that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).   "Prison conditions" means ". . . conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings."   18 U.S.C. § 3626(g)(2).   In *Booth v. Churner*, 532 U.S. 731 (2001), the Supreme Court of the United States held that exhaustion of administrative remedies is mandatory, regardless of the type of relief sought or offered through the administrative procedures.   *Id.* at 741.   In *Booth*, the Court required exhaustion even where the grievance process does not permit the award of money damages, and the prisoner seeks only money damages, as long as the grievance tribunal has authority to take some responsive action.   *Id.*

In *Porter v. Nussle*, 534 U.S. 516, 532 (2002), the Court held "that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."   Not only must a prisoner exhaust his administrative remedies, but he must also do so properly.   Proper exhaustion "'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 2385 (2006) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002). [Emphasis in the original]). That is, a

prisoner must complete the administrative process in accordance with the applicable procedural rules of the process in place at the time, including the deadlines.

In *Jones v. Bock*, 549 U.S. 199, 216 (2007), the Supreme Court ruled that an inmate's failure to exhaust remedies under the PLRA is an affirmative defense. *Jones* also held that an inmate does not automatically fail to exhaust when he sues one or more defendants not named in the pertinent grievances. *Id.*, at 218. If a complaint contains claims, some of which have been exhausted, and some of which have not been exhausted, the entire complaint is not dismissed; the court proceeds only on the exhausted claims. *Id.*, at 219-224.

However, the Supreme Court has emphasized that administrative remedies must indeed be "available." *Ross v. Blake*, 136 S. Ct. 1850 (2016). As noted in *Ross*, a prisoner must exhaust only those grievance procedures that are "capable of use for the accomplishment of a purpose" and which are "accessible or may be obtained." 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 737-38). The *Ross* decision discusses three ways in which an administrative remedy may be considered "unavailable," including "when prison administrators thwart inmates from taking advantage of a grievance process . . . ." *Id.* at 1860. Here, the plaintiff has asserted that he attempted to file timely grievances following the May 6, 2013 and June 7, 2013 incidents, but his alleged grievances were probably disposed of without an answer. Thus, he disputes that such remedies were available.

The federal courts that have addressed the issue have found that there is no right to a jury trial on factual disputes concerning an inmate's failure to exhaust the PLRA administrative remedies, and that the district court must resolve such disputes prior to

12

any consideration of the merits of the underlying claim.  *See Messa v. Goord*, 652 F.3d 305, 308 (2d Cir. 2011) (summarizing cases holding similarly in other circuits); *see also Hill v. Haynes*, No. 3:06-cv-136, 2014 WL4197588, *3 (N.D. W. Va. Aug. 22, 2014) ("The circuit courts of appeal have uniformly held that a judge can resolve factual disputes concerning exhaustion of administrative remedies under the PLRA.")

In 2013, when the incidents about which the plaintiff now complains occurred, the inmate grievance process required an inmate to file a grievance, utilizing a specified grievance form made available to inmates in housing units and law libraries, within 15 days of the occurrence.  *See* W. Va. Code R. § 90-9-4.1.  Each grievance may only address one issue.  *See* W. Va. Code R. § 90-9-4.2.  The grievance is submitted by the inmate to his Unit Manager, who shall log the grievance and assign it a number.  *See* W. Va. Code R. § 90-9-4.3.  The inmate is also expected to receive a copy of the grievance form prior to its submission at each level of the process.  *See* W. Va. Code R. § 90-9-4.6.

Prior to responding to the grievance, the Unit Manager shall inspect the grievance to determine whether it was filed in a timely manner and otherwise complies with the proper format and other requirements.  If the grievance does not comply with the requirements, the Unit Manager shall reject it, noting the reason for the rejection and return it to the inmate.  Grievances rejected for reasons other than untimeliness or for raising claims that were previously raised in another grievance, may be resubmitted within five days.  *See* W. Va. Code R. § 90-9-4.4.  A rejected grievance does not exhaust the grievance process or any particular step thereof. *See* W. Va. Code R. §§ 90-9-4.4, 90-9-6.4.

The Unit Manager must ensure that a grievance is answered within five days and must ensure that the staff member to which the grievance pertains is not responsible for answering the grievance. *See* W. VA. CODE R. § 90-9-4.5. If the Unit Manager fails to answer or reject the grievance within five days, the inmate may treat the non-response as a denial thereof, and must proceed to the next level of review by the Warden, indicating on the form that it is being filed without a response by the Unit Manager. *See* W. VA. CODE R. § 90-9-4.7.

Should the response at the Unit Manager level not resolve the issue, the inmate may appeal to the Warden within five days of delivery of the response (or when no response is received, as discussed above). The Warden shall respond to the appeal within five days. *See* W. VA. CODE R. § 90-9-5. Likewise, if the matter is not resolved at the level of the appeal to the Warden, or if the Warden does not respond within the applicable time period, the inmate must appeal to the Commissioner of Corrections within five days of the response or when the applicable time has passed. *See* W. VA. CODE R. § 90-9-6.1. The Commissioner shall respond to the appeal within 10 days. *See* W. Va. Code St. R. § 90-906.4. This procedure is also outlined in Policy Directive 335.00, which is cited in the Inmate Handbook, along with a chart of these mandatory deadlines (ECF No. 56, Ex. D). The plaintiff acknowledged receipt of the Inmate Handbook on October 23, 2012. (ECF No. 56, Ex. E).

The plaintiff's Motion/Response wholly failed to address the exhaustion defense. However, during his deposition, the plaintiff asserted that he did attempt to file initial grievances concerning both the May and June 2013 incidents within the required time periods, but never received a response to them. (ECF No. 56, Ex. G at 55-56, 84, 92-93;

Ex. H at 18-21; 38-39). The plaintiff was asked about when and how he filed such grievances and why they would not have been logged and answered. The plaintiff could not identify the correctional officer(s) to whom he allegedly gave such grievances and he further speculated that they were thrown away by someone without a response. (ECF No. 56, Ex. H at 18-21; 37-39). Thus, he can offer no evidence, beyond his own assertions, to support his contentions, and he overlooks the fact that the grievance policy requires that the inmate be provided a copy of each grievance prior to its submission. Moreover, the plaintiff ignores the fact that the grievance process permits an inmate to treat an unanswered grievance as denied, and further requires an inmate to continue the appeal process, pointing out the failure to receive a response at the first level.

A number of grievances are attached to the plaintiff's Complaint. While none of the attached grievances were filed within 15 days of either the May 6, 2013 or June 7, 2013 incidents, the plaintiff has included several grievances filed on September 10, 2013 and October 4, 2013, which address the May and June 2013 incidents. According to these exhibits, on September 10, 2013, the plaintiff filed a grievance that stated as follows:

> Due to never receiving a response back from my initial grievance on this matter, I am filing another one. During the month of May, I was shot with a CO2 activated pepperball gun and sprayed with chemical agents during Simpson's shift, because I would not give up my Bible/religious materials, etc.

(ECF No. 1, Ex. 17). This grievance was rejected as being untimely at all levels of the grievance process. (*Id.*) Another grievance was submitted on that same date concerning the June 7, 2013 incident, which was similarly rejected. (*Id.*, Ex. 18).

It further appears that the plaintiff filed yet another grievance on September 10, 2013, stating as follows:

> I am grieving the fact that I've submitted numerous grievances specifically
> on the use of excessive force. I submitted a grievance back in June 2013
> when I was shot 35-40 times with a pepperball gun and have yet to have
> received a response from administration for that. The policy says you have
> 5 days to reply.

(*Id.*, Ex. 19). The initial response to this grievance states, "There are no grievances on file from you regarding this issue during that timeframe. You have fifteen days of any occurrence to file a grievance." (*Id.*) The rejection of this grievance as untimely was also upheld by the Warden and Commissioner. (*Id.*) Then, on October 4, 2013, the plaintiff filed yet another grievance stating as follows:

> Over the past 6-7 months, excessive force has been repeatedly used on me
> for the slightest infraction and, in some instances, there were no infractions.
> In May, I was shot with a pepperball gun because I wouldn't give my Bible
> and religious materials to the correctional officers. In June, I was shot with
> a pepperball gun in excess of 35 to 40 rapid fire shots because I refused a
> haircut that I was clearly not in dire need of. Last week, in Sept. I was
> physically assaulted while my hands were cuffed behind my back and leg
> restraints were on my ankles. I am grieving the unnecessary repeated use
> of excessive force upon me over the course of the past 6-7 months.

(*Id.*, Ex. 2). The initial response to that grievance was that "all use of force incidents are reviewed by committee and addressed as deemed appropriate/necessary." (*Id.*) However, the Warden subsequently rejected the appeal of the grievance because it addressed three issues concerning three different dates. (*Id.*) The defendants assert that "this attempt by the Plaintiff to file an untimely grievance concerning alleged force being used against him on May and June 2013 is clearly an effort by the Plaintiff to correct his mistake in not filing grievances timely." (ECF No. 65 at 7)

In response to the plaintiff's deposition testimony stating that he had filed grievances concerning the May and June 2013 incidents that went unanswered, defense counsel asked him about another grievance that was filed on or about May 15, 2013,

concerning the failure to receive his mail. (ECF No. 56, Ex. H at 43-46). That grievance was logged and answered in a timely fashion on May 16, 2013 (and the signature on the first level response appears to say "Capt. Matheny.") (*Id.* at 60, Depo. Ex. 1). The plaintiff then testified that he believes he filed the other grievance(s) on the same date.[4] (*Id.* at 45). The following discussion then occurred:

> Q. Okay. But you received a timely response to this grievance?
>
> A. That's correct.
>
> Q. You had the ability to write this grievance because you did?
>
> A. That's correct.
>
> Q. And this grievance was, in fact, written --
>
> A. Ten days after May the 6th.
>
> Q. Well, within nine days after May the 6th.
>
> A. May the 16th.
>
> Q. Well, this says May the 15th.
>
> A. May the 15th?
>
> Q. Correct. Is that the way you make a six?
>
> A. Yeah. That's a six.
>
> Q. Well --
>
> A. I'm quite sure I wrote that grievance on the same day I wrote the other grievances.
>
> Q. It's your testimony that this one made it into the form, but the other one didn't?

---

4 The undersigned notes that, as of May 15, 2013, the June incident had not yet occurred, so the plaintiff could have only filed a grievance concerning the May 6, 2013 event at that time.

A.    That must be the -- That must be how it happened.

Q.    And so, sir, when you got a response on this one, what was your -- what was your -- what was your reason for wondering -- for -- for wondering -- Why didn't you wonder or do something about the fact that the other grievances had no response to them?

A.    I didn't wonder.   I knew.

Q.    Okay.   Did you request the opportunity to make another grievance about that?

A.    Why would I do that when I know that if this one got thrown in the trash, then another one on the same incident, as long as I'm behind the glass, is going to get thrown in the trash?

Q.    Couldn't you make it to another officer?

A.    Obviously not because they report it to a higher authority.

Q.    So your belief is it wasn't the officers who trashed it, it was a higher officer who trashed it?

A.    Probably so.

Q.    A unit manager?

A.    Probably so.

Q.    So they managed to make those grievances go through the system, but the grievances regarding documented videotaped cell extraction and another use of force, those grievances were hidden?

A.    That's right.

Q.    That's your testimony?

A.    That's correct.   That's just the facts.

Q.    Okay.   Yet --

A.    I don't know why they do what they do.

Q.    Yet you didn't bring it to anybody's attention that that process apparently had happened to you until September?

18

A.     That's correct.   After I was removed from behind the glass.[5]

(*Id.* at 44-46).   The plaintiff then confirmed that he had been provided the Inmate Handbook containing the grievance process and confirmed that he was aware of it at the time he filed the May 15 (or 16) grievance concerning his mail.   (*Id.* at 47).   However, he denied knowing that there was a five-day response period because "I didn't read their policy."   (*Id.*)

Thus, the plaintiff's testimony appears to assert that the person(s) who handled the alleged grievances must have selectively chosen to log and respond to the one about his mail, but not the grievance concerning the uses of force.   (*Id.*)   The plaintiff further testified about how he obtained the grievance forms and a pen to complete these alleged grievances while he was on the BMP.   On more than one occasion, the plaintiff testified that he obtained the paperwork and pen by using a magnet that he had in his cell.   (ECF No. 56, Ex. H at 36-37, 40-41).   This testimony is simply not credible.

Although the exhaustion issue was not addressed in the plaintiff's Motion for Summary Judgment/Response, his Reply concerning his own Motion for Summary Judgment does address the exhaustion issue as follows:

> During May and June of 2013, Plaintiff was house[d] "behind the glass" where it is easier for officers to place forms in their pockets without anyone of DOC authority noticing.   In September, however, Plaintiff was no longer living in that section of the unit and could file without destruction of his grievances.   This explanation was explained during the deposition and to claim that no explanation has been alloted [sic; allotted] when several have been is to deviate from the truth which is exactly the same as lying.

---

5   The plaintiff makes several references to having been "behind the glass."   As described in his deposition, "behind the glass is where they place people that they feel have a behavior problem, is what they say, or people that just rub them the wrong way, and it consists of 8 cells in a 98-cell unit.   And usually people don't get treated very good back there."   (ECF No. 56, Ex. G at 57).

(ECF No. 68 at 7).

With respect to the evidence of record concerning the plaintiff's attempts to exhaust his administrative remedies, the undersigned proposes that the presiding District Judge **FIND** that there is no credible evidence to support a finding that the plaintiff timely and properly exhausted the available administrative remedies, or that he was in any way prohibited from doing so. Because the plaintiff failed to properly exhaust his administrative remedies concerning the May 6, 2013 and June 7, 2013 incidents, this court cannot review the merits thereof, and all claims arising out of those incidents must be dismissed as a matter of law.

Accordingly, to the extent that Counts One, Two, Four and Five address claims concerning conduct that occurred on May 6, 2013 and June 7, 2013, the undersigned proposes that the presiding District Judge **FIND** that the defendants are entitled to judgment as a matter of law on those claims.

**B. The plaintiff's Eighth Amendment claims concerning the September 26, 2013 incident.**

The parties do not dispute that the plaintiff properly exhausted his administrative remedies concerning the September 26, 2013 incident. Thus, the undersigned will proceed to address the merits of the parties' summary judgment motions with respect to that incident.

The central issue in this case is whether the defendants' conduct violated the plaintiff's right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment of the United States Constitution. In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes

duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  This is a low standard.   The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.* at 833.

"An inmate's Eighth Amendment claim involves a subjective component and an objective component."   *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008); *see also Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) ("Determination of whether the Eighth Amendment has been violated requires analysis of subjective and objective components.") (citing *Wilson v. Seiter*, 501 U.S. 294, 302 (1991))).   "Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams*, 77 F.3d at 761.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.   "The objective component focuses not on the severity of any injuries inflicted, but rather on 'the nature of the force' which must be 'nontrivial.'"   *Tedder v. Johnson*, 527 F. App'x 269, 272 (4th Cir. 2013) (quoting *Wilkins v. Gaddy*, 559 U.S. 34 (2010)).

Considering the objective component first, although the defendants contend that the plaintiff did not suffer any serious injury, the evidence demonstrates that, as a result of being slammed to the floor by defendants Blagg and Fernandez, while restrained, the

plaintiff suffered a laceration to his head and further contends that he suffered "injury to his vertebras [sic; vertebrae], and spinal disc, has trouble with movement and a great deal of pain in his back." (ECF No. 1 at 13, ¶ 36). He has submitted portions of his medical records demonstrating continuing complaints about such pain and a picture of his head injury on September 26, 2013. (ECF No. 1, Exs. 12-16, 20-22; ECF No. 60-1, Ex. 22). Taking this evidence in the light most favorable to the plaintiff, there is evidence from which an inference can be drawn that the force used against him was "non-trivial" and there is, at least, a genuine issue of material fact as to whether the plaintiff can establish the objective component of an Eighth Amendment claim.

Turning to the subjective component, the Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6. The *Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320. The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547). Thus, the Court stated that "[u]nless it appears that the

evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury."   *Id.* at 322.

In *Whitley*, the Court set forth the following factors that must be weighed in determining whether force was applied in a good faith effort to maintain or restore order, or whether it was done so maliciously and sadistically for the very purpose of causing harm: (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response.   *Whitley*, 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996).   The parties' briefs address these factors with respect to the conduct of defendants Blagg and Fernandez.

The plaintiff asserts that defendants Blagg and Fernandez used excessive physical force against him when they moved him to a shower while a cell search was being conducted.   He further described this incident during his deposition as follows:

Q.    With respect to the actual incident at the shower, it's your testimony, as I understand it, it's your - - well, tell me what your claims is that happened at the shower.

A.    I was told to shoulder up.   I shouldered up.

Q.    Okay.

A.    I was told to put my feet back.   I placed my feet back.   The officer said, "We're getting pretty tired of your shit around here."   He said, Place your GD feet back farther."   I said, "I can't place my feet back any farther."   He jerks me off the wall, slams me to the floor, starts slamming my face off the floor and beating me.

Q.    How is he beating you?

A.      Punching me.

Q.      Where?

A.      My head.

Q.      Where on your head?

A.      My whole body.   Wherever he could hit me.

Q.      Okay.   What parts of his body was he using?

A.      His fist.

Q.      Okay.   Anything else?

A.      That's about it.

Q.      Which officer was doing this?

A.      Blagg.

Q.      Okay.

A.      I contest that Blagg states that he was the one holding me up on the wall.   That's not the truth.

Q.      What's the truth?

A.      Fernandez is the one that was holding me up on the wall, and Blagg was refuse - - removing the shackles.

Q.      Okay.

A.      Fernandez was behind me.   Blagg was to my right.   Blagg jerked me off the wall to my left and slammed me down on my face like that inside the shower.

(ECF No. 56, Ex. G at 65-67).   The plaintiff further denied that he came off of the wall and contended that the defendants' actions demonstrated a "wanton and willful intention to hurt [him]."  (*Id.* at 71).

The defendants do not dispute that force was used against the plaintiff on September 26, 2013. Their Memorandum of Law in support of their Motion for Summary Judgment states in pertinent part:

> The altercation between correctional officers [and the Plaintiff] occurred in the shower, when the Plaintiff refused to follow simple directives to remain shouldered up against the wall while he was shackled. There is no doubt from the incident reports and deposition testimony of the Plaintiff that the inmate was taken down to the ground by a correctional officer and that the Plaintiff sustained three open areas on the right temporal portion of his head and a small scrape on the right side of his forehead. As the incident reports reflect, however, the areas in question were cleaned and bandaged and that no further medical attention was required. Consequently, the question as to the September 26, 2013 incident turns on the proposition of whether the force utilized by the correctional officers in taking down the Plaintiff when he refused to shoulder up was excessive force. (*See* Exhibit C Use of Force Report).

(ECF No. 57 at 15).[6] The defendants contend that, under the circumstances, Blagg and Fernandez used physical force against the plaintiff in a good faith effort to get him to comply with their orders so that they could safely restrain him in the shower. Their Memorandum of Law states:

> It is important to view the context of the September 26 incident in that it is the culmination of a series of events over the past several months in which the inmate has shown repeated reluctance on every occasion when he has been directed to leave his cell so that it could be searched. On this occasion of September 26, the sworn testimony of the Plaintiff shows that he engaged in a continuing dialogue with the correctional officers while being escorted to the shower that showed his reluctance to be away from his cell. At the time of his takedown to the ground in the shower, the Plaintiff had again refused a simple directive to shoulder up against the shower wall. There is no argument that the Plaintiff received minor injuries, *i.e.*, cuts and scrapes to his head when he was taken down. But there is no evidence to support the proposition that the correctional officers [Blagg] and Fernandez acted

---

6 The video produced by the defendants from September 26, 2013 did not capture the incident itself, but illustrates the injuries sustained to the plaintiff's head and the evaluation and treatment thereof by medical staff. The video also captures the plaintiff's explanation of the incident and that of Sergeant David Miller, who was not one of the officers involved in the use of force, but who was reporting what the officers involved had told him. (ECF No. 71, 9-26-13 disc).

in a malicious or sadistic fashion to bring about serious personal injury to the Plaintiff. Instead, the evidence clearly shows that the Plaintiff was immediately taken to see medical personnel (nurses) where they bandaged and addressed his minor injuries. Again, the very fact that the Plaintiff received any injuries at all on this occasion is once again the result of the Plaintiff's simple failure to abide by instructions and/or directives given to him by correctional officers.

(ECF No. 57 at 16).

The Use of Force Committee Report concerning this incident, which is supported by the Incident Reports of defendants Fernandez and Blagg, and of Correctional Officers Joe Hill, Jr., David Miller and Patrick Galapon, summarizes this incident as follows:

On Thursday, 26 September 2013 at approximately 0900 hours, Sgt. Michael Blagg and Cpl. Brian Fernandez were conducting a strip [sic] a strip search on inmate Kristopher Creel #51575 in Pod 5 of Quilliams 2. The officers were removing him from his cell (509), so a cell search could be conducted. Inmate Creel had to be given repeated direction throughout the strip search process; at one point, the inmate left the officers' line of sight causing the process to start over.

When the mechanical restraints were placed on him, he again refused to follow direction and was non-compliant. Inmate Creel was secured in restraints, the hand-on escort started and they proceeded to the shower on the upper tier of Pod 5. During the escort, the officers gave him multiple directions to walk with his head facing forward and to stop attempting to stop walking. The inmate made several derogatory comments following the officer's commands.

When they arrived at the shower, he was directed to place his left shoulder against the shower door and to take one step back with his feet; however, he refused. He was given additional instruction in an effort to temper force; he was compliant and placed his shoulder on the wall.

Cpl. Fernandez bent down to remove his leg restraints; inmate Creel turned his upper body in a rapid manner to his right side and removed his left shoulder from the wall. As a result, Sgt. Blagg grapsed the inmate's right elbow with his right hand and pushed forward on the inmate's right shoulder with the palm of his left hand, using his right heel, he struck the top of the inmate's right foot (superficial peroneal). With Cpl. Fernandez's assistance, he was then able to secure the inmate in non-threatening position on the floor on the top tier in pod 5.

Directly following the takedown, inmate Creel was verbally abusive toward the officers. When his verbal threats stopped, he was escorted to the unit multipurpose room where he was evaluated and treated by Licensed Practical Nurse Joyce Coleman and Graduated Practical Nurse Alyssa Crist.

No injuries were sustained by staff during this incident. Digital photographs were taken of the inmate's injuries, which were minor.

(ECF No. 56, Ex. C). Thus, the defendants assert that the plaintiff was repeatedly non-compliant, resistant and abusive. The Use of Force Committee recommended no further action as a result of this incident, and Warden David Ballard concurred in that decision. (*Id.* at 3).

The plaintiff's Motion for Summary Judgment/Response to the defendants' Motion for Summary Judgment asserts that the defendants are lying about his alleged resistance during this incident. (ECF No. 60 at 23). He states:

[I]t is simple to see that only two correctional officers have fabricated their entire story because only two correctional officers of all the State's witnesses claim that this plaintiff had resisted them all the way down the tier . . . .

[I]t is strikingly peculiar how officers in the pod Joe Hill, David Miller, and Patrick Galapon could all hear the camotion [sic; commotion] at the shower, but not one of these witnesses report hearing the "camotion" [sic; commotion] which officers Blagg and Fernandez report occurring as they escorted this plaintiff from his cell to the shower. [See Ex. 16].

Had the plaintiff really been resisting as he was walking down the tier Sgt. Joe Hill would have immediately instructed Patrick Galapon to obtain the video camera as he did when he heard the defendants assaulting Plaintiff at the shower. [Ex. 16c]. Had the plaintiff been showing any signs of aggression no officer in their right mind would then want to unrestrain that individual. And if the defendants want to say that they desperately needed those restraints, their [sic; there] is a restraint slot at the bottom of the shower door so that any aggressive individual may be secured in that shower and their restraints still obtained without risk of physical harm to either individual, as pad locks are used to secure the metal shower doors as well.

(ECF No. 60 at 22-24).   The plaintiff further maintains that he was restrained, and acting in full compliance with the defendants' commands and, thus, no force was necessary. (*Id.* at 26, 28-29).   He further contends that "this was a method of intimidation, humiliation, and physical assault/torture to physically punish the plaintiff for the defendants' own amusement."   (*Id.*)   The plaintiff also asserts that other inmates who were eye or ear witnesses to this incident support his version of the facts.   (*Id.* at 27-28).

The witness summary of inmate Steven Walker states as follows:

> On 9/26/13, I unfortunately witnessed some things that seemed to me were not needed.   The incident I speak of happened on 9-26-13.   I was sent from cleaning the day room to my cell.   Upon entering my cell, the 2 Sgt. was coming up the stairs.   They then stopped.   Apparently they were at cell 9 cause they never passed cell 10 or my cell which is 11.   I then seen Inmate Creel and the 2 Sgts. walk pass[ed].   However, Creel could not keep up with them due to the shackles.   I overheard the one Sgt. say quit dragging and keep up with our pace.   He was very intense verbally as in saying shut the f\*\*k up or I'll slam your a\*\*.   So then they reached the shower.   Then the[y] asked Creel to shoulder up.   To which Creel did. Then he spread his feet.   To which he did.   However, the Sgts. were not satisfied with his effort.   So then before Creel could say anything, I seen one of the Sgt. slam the Creel guy onto the shower floor and began to abuse him verbally and physically.   I then seen other officers come up and advised me to get on my bunk as they went to assist the Sgts.   I'm not entirely sure why the incident was taken to that level.   It seems as if there's some problems with that inmate.   As if it were just retaliation or a vandetta [sic; vendetta] towards Creel.   It seems as if they are mad or still trying to punish him for past mistakes?

(ECF No. 1, Ex. 7; ECF No. 60, Ex. 19).

The declarations of Andre Wilson and Lawrence Stuckey similarly assert that they saw or heard the incident involving the plaintiff and Blagg and Fernandez.   The Wilson declaration states that Wilson witnessed Blagg and Fernandez "pushing and shoving inmate Creel all the way down the tier towards the shower, telling him how they were sick and tired of his sh-t and how they were going to show him what bad was all about . . ."

28

(ECF No. 1, Ex. 8, ECF No. 60, Ex. 20).   Wilson states that Creel did not even respond.

The Wilson declaration further states:

> Once getting to the shower, Creel did shoulder up per protocall [sic; protocol], but officer Blagg yelled at inmate Creel "Back, back, scoot your f-cking feet back farther!!"   Inmate Creel was standing almost horizontal to the wall, his shoulder up against the wall and his feet way behind him.   At this time, Blagg slammed inmate Creel face first into the shower floor and said to Creel, "I told you about that tough guy sh-t didn't I boy?"   It looked like Blagg was rubbing Creel's face right into the shower floor.   Blagg stated something else, but I could not hear him clearly.

(*Id.*)[7]   The Stuckey declaration also confirms these actions by Blagg, and states that Blagg "was saying stuff like 'You aren't so tough now are you boy' [and] called him a 'punk' and 'little bitch.'"   (ECF No. 1, Ex. 9; ECF No. 60, Ex. 21).   Stuckey's declaration further states:

> Inmate Creel ask[ed] why are you doing this and Sgt. Blagg said because I can and you can't do anything about it.   He then got off inmate Creel and when he saw me told me to go set on my bunk.   Get away from the door. They then jerked him out of the floor and when they walked him by my cell door I could see some blood on inmate Creel's face.   They took him out of the pod and when they brought him back he had a bandage on his face.

(*Id.*)

Under the totality of the circumstances, the undersigned proposes that the presiding District Judge **FIND** that there is a genuine issue of material fact concerning whether the force used against the plaintiff on September 26, 2013 was used in a good faith effort to restore order, or maliciously and sadistically to cause harm to the plaintiff. Upon further consideration of this evidence, a factfinder may determine which version of the evidence is more credible but, at this stage of the proceedings, this court may not

---

7   It appears that there is a second page to the Wilson declaration that was not copied in the exhibits sent to the court.

weigh such credibility.    Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that disputed material facts prohibit a finding that defendants Blagg and Fernandez are entitled to judgment as a matter of law on Count Three of the plaintiff's Complaint.

### C.    The plaintiff's due process claims.

In Count Four of the Complaint, the plaintiff asserts that, on several occasions he was placed on the Behavioral Management Plan (BMP) and had his personal property taken from him without due process.    He contends that, because defendants Ballard and Rubenstein are responsible for the implementation of the BMP and approved his placement therein, their conduct was objectively unreasonable and violated his clearly established right to due process of law under the Fourteenth Amendment.    (ECF No. 1 at 14-15).    However, he has produced no evidence demonstrating that either Ballard or Rubenstein were directly involved in his placement on BMP.

As previously stated herein, to the extent that the plaintiff is asserting this claim with respect to his placement on BMP and temporary loss of his property due to the incidents on or about May 6, 2013 and June 7, 2013, those claims are barred for his failure to properly exhaust the administrative remedy process.    However, the Complaint further alleges that, as a result of the incident on September 26, 2013, he was again placed on BMP and his property confiscated.    Thus, the undersigned will address this claim with respect to that conduct.

The plaintiff has attached three grievances addressing his placement on BMP and having his property temporarily confiscated.    Those grievances are dated September 30, 2013, October 3, 2013 and October 23, 2013.    (ECF No. 1, Exs. 24-26).    Each grievance

asserts that the plaintiff's placement on BMP and taking of his property for a period of 3-10 days without holding a hearing to determine guilt or innocence violates his due process rights and constitutes punishment.

The September 30 and October 3 grievances were rejected as having been answered on a similar grievance. However, the Unit Manager provided the following response to the October 23, 2013 grievance, which addressed the plaintiff's placement on BMP after oranges were found in a bottle in his cell on October 13, 2013 (an issue which is not specifically addressed in the Complaint):

> BMP – Behavior Management Plan is a special control designed for inmates who continuously and repeatedly refuse to comply with rules/regulations. Making or attempting to make alcohol is a behavior issue and it['s] being managed just as your other behavioral issues. Subsequent charges of rule violations are disciplinary in nature.

(*Id.*) The Warden then affirmed the response stating:

> You are not being harassed. Losing privileges in regard to the Quality of Life program is not the same as a Correctional Hearing Officer's disposition as a result of a rule violation.

(*Id.*) These responses were also upheld by the Commissioner. (*Id.*)

The defendants' motion documents fail to address the plaintiff's due process claim. With respect to the confiscation of his property following the September 26, 2013 event, the plaintiff's Motion/Response states that:

> All of [his] property was being confiscated because of an alleged accusation against him, without any hearing being held to give Plaintiff the opportunity to dispute any evidence against him, nor was he given an opportunity to cross examine any witnesses or their testimony to determine a finding of innocence or guilt based on some investigation into this matter. In fact, there was no investigation whatsoever, and the plaintiff asserts that this was a method of intimidation, humiliation, and physical assault/torture to physically punish the plaintiff for the defendants' own amusement.

(ECF No. 60 at 25-26).

The Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits a State from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. However, as a result of his conviction and imprisonment, the plaintiff's protected interests are significantly reduced.

As noted by the Supreme Court in *Sandin v. Conner*, "the Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner" and "the Due Process Clause did not itself create a liberty interest to be free from intrastate prison transfers." 515 U.S. 472, 478 (1995) (citing *Meachum v. Fano*, 427 U.S. 215 (1976)). In the prison context, a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. In *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997), the United States Court of Appeals for the Fourth Circuit reiterated that, "[i]n order to prevail on either a procedural or substantive due process claim, inmates must first demonstrate that they were deprived of life, liberty, or property" by governmental action.

Under the reasoning in *Sandin*, the *Beverati* Court further held that neither the fact that an inmate was placed in administrative segregation, nor the general conditions therein, resulted in confinement that is atypical or posed a significant hardship on the inmate vis-a-vis ordinary prison life, so as to give rise to a liberty interest protected by the Due Process Clause. *Id.* at 502-504. Furthermore, to the extent that the plaintiff has asserted that his property was confiscated for 3-10 days at a time, a temporary deprivation of personal property is not an atypical and significant hardship and does not state a

32

cognizable Fourteenth Amendment due process claim. *See, e.g., Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (no due process violation where an inmate's property is taken in connection with his reclassification to a status in which he is not authorized to possess certain property); *Chhoun v. Woodford*, No. C 03 3219 SI, 2005 WL 1910930, at *6-9 (N.D. Cal. Aug. 10, 2005) (temporary deprivation of personal property did not violate prisoner's due process rights).

Similarly, to the extent that the plaintiff may be claiming that his placement on BMP and the deprivation of his property constitutes punishment, "temporary inconveniences and discomforts" are insufficient to state an Eighth Amendment claim. *See, e.g., Adams v. Pate*, 445 F.2d 105, 108-09 (7th Cir. 1971); *see also Cherry v. Berge*, 2005 U.S. Dist. LEXIS 9636 (W. D. Wisc. May 17, 2005) (two week denial of hygiene supplies to an inmate on BMP did not state Eighth Amendment claim).

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that Count Four of the plaintiff's Complaint fails to state a claim upon which relief can be granted and, thus, the defendants are entitled to judgment as a matter of law thereon.

### D.     The plaintiff's supervisory liability claims.

Count Five of the Complaint also asserts claims of supervisory liability against defendants Ballard and Rubenstein.   (ECF No. 1 at 15).   The Complaint contains general, conclusory allegations that Ballard and Rubenstein "knew or should have known of the pervasive and widespread abuse of inmates at MOCC" and "failed to properly investigate, train, supervise, and discipline the named defendants and other CO's at MOCC to prevent injuries such as those sustained by Plaintiff."   (*Id.*, ¶ 62).   The plaintiff

contends that this "wilfull, wanton, intentional and malicious" conduct amounts to deliberate indifference and, thus, these defendants should be held liable to him under the Eighth Amendment.   (*Id.*, ¶¶ 63-66).

During his deposition, the plaintiff was asked to about his allegations against these defendants.   He stated:

> A.    I'm stating that they knew that I would be placed at a substantial risk of harm and injury.
>
> Q.    They knew of that specifically?
>
> A.    Yes, because to conduct a cell extraction, they have to approve it.
>
> Q.    You're saying that Mr. Rubenstein has to approve a cell extraction when his office is in Charleston?
>
> A.    David Ballard does, and Mr. Rubenstein is over top of reviewing investigations pertaining to the incident, and he turned a blind eye and didn't properly investigate the incidents.
>
> Q.    So the allegations you have against Mr. Ballard and Mr. Rubenstein have to do with the policies of the - - of the jail as a whole, or the prison, correct?
>
> A.    Not as a whole, but pertaining to those incidents.

(ECF No. 56, Ex. G at 91).

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Fourth Circuit clearly established that a supervisor may be liable for the actions of his subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved, prior constitutional violations.   Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."   13 F.3d at 798 (*quoting Slakan v. Porter*, 737

F.2d 368 (4th Cir. 1984)).

The defendants' Memorandum of Law addresses the *Shaw* elements in relation to the plaintiff's claims against defendants Ballard and Rubenstein. (ECF No. 57 at 17-18). The Memorandum of Law further asserts that the plaintiff has not alleged, and cannot establish, that either of these supervisors are liable for the actions of the other defendants herein. Specifically, the Memorandum states:

> To the extent that Defendants Ballard and Rubenstein may have responded to an administrative grievance filed by the Plaintiff, it is insufficient to sustain a cause of action. The dismissal of a defendant is appropriate where the defendant's sole involvement in an action is related to the administrative remedy process. *See Fellove v. Heady*, 2008 WL 19[6]420, *4 ([N.D. W. Va. Jan. 22, 2008]) (stating that "to the extent that plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state a *Bivens* claim.")

> Consequently, it is clear that the Plaintiff herein has failed to specify any action taken by Defendants Ballard and Rubenstein that violated Plaintiff's constitutional rights. Thus, the Plaintiff has improperly alleged a cause of action against Defendants Rubenstein and Ballard under the doctrine of respondeat superior, and his claims must be dismissed, and the granting of summary judgment in favor of Defendants Ballard and Rubenstein is appropriate and proper.

(*Id.* at 18).

As previously stated herein, to the extent that the plaintiff is asserting supervisory liability claims against Ballard and Rubenstein arising out of the incidents on or about May 6, 2013 and June 7, 2013, those claims are barred for his failure to properly exhaust the administrative remedy process. Additionally, in light of the recommended dismissal of the plaintiff's due process claim in Count Four, the only potential liability defendants

Ballard and Rubenstein could have as supervisors concerns the incident on September 26, 2013, as addressed in Count Three of the Complaint.

After asserting that defendants Blagg and Fernandez fabricated their version of this incident, the plaintiff's Response addresses the conduct of the supervisors with respect to this incident as follows:

> Once again as in any other case of excessive force, their superiors the Use of Force Committee [See Ex. 15] failed to properly investigate and indifferently turned a blind eye to this sadistic attack and even covered it up by saying it was justified or in their own words, "the use of force was used within agency policy, procedure and training."

(ECF No. 60 at 23).   Thus, the plaintiff appears to assert that Ballard and Rubenstein tacitly authorize such behavior by upholding the findings that such use of force was appropriate, without conducting any investigation and without taking any disciplinary action against the staff involved.   (*Id.* at 23-27).   The defendants' Reply fails to address these allegations.   (ECF No. 65).   The plaintiff reiterates these contentions in his Reply. (ECF No. 68 at 10).

Defendant Ballard concurred in the finding that the use of force against the plaintiff on September 26, 2013 was appropriate and that no further action was to be taken.   (ECF No. 56, Ex. C).   In *Shaw*, the Fourth Circuit held that "liability is ultimately determined by pinpointing the person/persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked."   13 F.3d at 799.   Construing the evidence in the light most favorable to the plaintiff, there are genuine issues of material fact concerning whether excessive force against the plaintiff was used or permitted by Ballard's subordinate officers and whether he sanctioned such force.   Accordingly, the undersigned proposes that the presiding District Judge **FIND**

that Ballard is not entitled to judgment as a matter of law on the plaintiff's supervisory liability claim.

However, the plaintiff fails to present sufficient evidence of actual or constructive knowledge by defendant Rubenstein of the specific alleged misconduct. The only direct involvement of Rubenstein in the allegations contained in the Complaint may be his role in receiving and affirming administrative remedies. However, as noted by the defendants, it is well established that denying a prisoner's grievances, by itself, "is not the type of personal involvement required to state an [Eighth Amendment] claim." *See, e.g., Lowe v. Matheney*, No. 2:13-cv-22416, 2015 WL 5795867 *9 (S.D. W. Va. Sept. 30, 2015) (Goodwin, J.) (inadequacy of allegations involving supervisory liability claim based upon denial of grievances); *see also Larson v.* Meek, 240 F. App'x 777, 780 (10th Cir. 2007); *Ferris v. Jones*, No. 4:14-cv-454, 2015 WL 4668297, at *9 (N.D. Fla. Aug. 5, 2015). Thus, the plaintiff's allegations concerning Rubenstein's supervisory liability are largely conclusory, speculative and unsupported by the record. For these reasons, the undersigned proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact concerning defendant Rubenstein's liability and, therefore, he is entitled to qualified immunity and judgment as a matter of law on the plaintiff's claims against him.

## RECOMMENDATION

Based upon the proposed findings contained herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the defendants' Motion for Summary Judgment (ECF No. 56) with respect to Count Four, in its entirety, with

respect to Counts One, Two and Five concerning the incidents on or about May 6, 2013 and June 7, 2013, and with respect to Count Five as to defendant Rubenstein.

It is further respectfully **RECOMMENDED** that the presiding District Judge otherwise **DENY** the defendants' Motion for Summary Judgment (ECF No. 56) and **DENY** the plaintiff's Motion for Summary Judgment (ECF No. 60), and set this matter down for a jury trial on the plaintiff's remaining claims in Count Three and Count Five and it pertains to defendant Ballard and the incident on September 26, 2013.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may only be granted by the presiding District Judge.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties and Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to the plaintiff and to transmit a copy to counsel of record.

August 9, 2017

Dwane L. Tinsley
United States Magistrate Judge