# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

KRISTOPHER D. CREEL,

                Plaintiff,

v.                                                CIVIL ACTION NO. 2:14-cv-10648

CORPORAL HUDSON, et al.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court are the Proposed Findings and Recommendation ("PF&R") of United States Magistrate Judge Dwane L. Tinsley and Plaintiff's objections thereto. (ECF Nos. 76, 77.) The PF&R addresses the parties' pending cross-Motions for Summary Judgment. (ECF Nos. 56, 60.) For the reasons that follow, the Court **ADOPTS** the PF&R and **OVERRULES** Plaintiff's objections. Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's Motion for Summary Judgment is **DENIED**.

### I. BACKGROUND

Plaintiff Kristopher Creel is a West Virginia inmate. On February 19, 2014, he filed the instant Complaint alleging claims under 42 U.S.C. § 1983. The claims arise from three separate altercations between Plaintiff and correctional officers at the Mount Olive Correctional Complex ("MOCC"). Each altercation ended with force being used against Plaintiff by MOCC correctional officers. On May 6, 2013 and June 7, 2013, Plaintiff alleges that correctional officers used a

pepper-ball gun and chemical agents against him for refusing to obey orders. On September 26, 2013, Plaintiff alleges that he was escorted from his cell to a shower while a search of his cell was conducted. After directing Plaintiff to lean against the shower door to facilitate removal of his leg shackles, Plaintiff claims that Defendant Blagg grabbed him by the neck, slammed him onto the shower floor, and delivered several blows to Plaintiff's face, head, and body.

Plaintiff sued each correctional officer directly involved in the altercations described above as well as MOCC Warden David Ballard and former West Virginia Corrections Commissioner Jim Rubenstein. The five-count Complaint alleges excessive force arising from the May 6, June 7, and September 26, 2013 incidents (Counts One, Two, and Three, respectively), "repeated" violations of due process related to the confiscation of Plaintiff's personal property incidental to his placement on disciplinary segregation (Count Four), and supervisory liability (Count Five).

Because Plaintiff proceeds *pro se*, this action was referred to the Magistrate Judge for pretrial proceedings. After a period of discovery, Defendants filed a join Motion for Summary Judgment on September 14, 2016. Plaintiff filed his own Motion for Summary Judgment on January 20, 2017.

The Magistrate Judge filed the PF&R on August 9, 2017, recommending that Defendants' motion be granted in part and denied in part and that Plaintiff's motion be denied. As to all claims associated with the incidents of May 6 and June 7, 2013, the Magistrate Judge found that Plaintiff did not exhaust his administrative remedies prior to filing suit and recommended judgment in favor of Defendants. As to Count Three, the Magistrate Judge reasoned that genuine issues of material fact remain and the claim should proceed to trial. To the extent the due process claims alleged in Count Four have been exhausted via the administrative process, the PF&R recommends dismissal

for failure to state a claim upon which relief can be granted. With these proposals, the only supervisory liability claim that remained was that related to the incident of September 26, 2013. The Magistrate Judge found that material factual disputes remain as to Ballard's liability for that incident. Finding the same could not be said with respect to the claims against Rubenstein, the Magistrate Judge recommended entry of summary judgment in favor of this Defendant.

Plaintiff filed timely objections on August 24, 2017. Defendants have not objected to the Magistrate Judge's findings and recommendation. Thus, the cross-Motions for Summary Judgment, the PF&R, and the objections are ready for disposition.

## II.     LEGAL STANDARDS

### A.     Review of the PF&R

"The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Failure to file timely objections constitutes a waiver of *de novo* review. 28 U.S.C. § 636(b)(1); *see also Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). In addition, this Court need not conduct a *de novo* review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the Magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

### B.     Legal Sufficiency of the Complaint

The Magistrate Judge engaged in *sua sponte* review of Count Four of the Complaint and thus invoked the standard applicable in testing the sufficiency of pleadings under Federal Rule of Civil Procedure 12(b)(6). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555. Elaborating on the *Twombly* holding in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678–79.

C. *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When evaluating such factual issues, the Court must

4

view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### III.    DISCUSSION

Plaintiff's objections are set forth in three parts.   The Court takes up each objection in the order presented.

*A.    Administrative Exhaustion*

Plaintiff objects to the proposed finding that the claims arising from the May 6 and June 7, 2013 incidents should be dismissed for failure to exhaust.   The parties agree that Plaintiff may not bring a federal civil action relating to these events absent exhaustion of available administrative

5

remedies. Plaintiff argues, however, that such remedies were not available to him because "Defendants, or Defendants' subordinates, destroyed the grievances to thwart his attempts to seek administrative remedies." (Obj. at 2.)

The federal Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust all available administrative remedies before challenging the conditions of their confinement in federal court. *See* 42 U.S.C. 1997e(a). Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The mandatory language of the PLRA "means a court may not excuse a failure to exhaust." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citing *Miller v. French*, 30 U.S. 327, 337 (2000).

"Failure to exhaust is an affirmative defense under the PLRA," *Jones v. Bock*, 549 U.S. 199, 216 (2007), and the burden lies with the defendant to prove that an inmate failed to exhaust available administrative remedies prior to filing a civil action. The Court is also mindful that "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010); *see also Lee v Willey*, 789 F.3d 673, 678 (6th Cir. 2015) ("[E]xhaustion under the PLRA is analogous to other threshold issues of judicial administration that 'courts must address to determine whether litigation is being conducted in the right forum at the right time.'" (quoting *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010))).

In West Virginia, "[a]n ordinary administrative remedy is considered exhausted when the inmate's grievance complies with duly promulgated rules and regulations regarding inmate

grievance procedures. . . ." W. Va. Code § 25-1A-2(d). The West Virginia Division of Corrections sets out its ordinary inmate grievance procedures in the Code of State Rules. "Any inmate who fails to fully and properly comply with the provisions set forth in [those rules] shall not be considered to have taken full advantage of administrative remedies afforded him/her and therefore has not exhausted administrative remedies." W. Va. Code R. § 90-9-3.4.

The procedure for filing a grievance is as follows. An inmate may file a grievance using forms provided by the prison "within fifteen (15) days of any occurrence that would cause him/her to file a grievance." § 90-9-4.1. Only one issue or complaint may be grieved per form, and the inmate must submit the form to his or her unit manager. §§ 90-9-4.2, 90-9-4.3. Upon receipt of the grievance form, the unit manager logs the grievance and assigns it a number. § 90-9-4.3. The unit manager is required to return an answer to the grievance back to the inmate within five days. § 90-9-4.5. If the unit manager fails to answer or reject the grievance within five days, the inmate may treat the non-response as a denial and proceed to the next level of review. Appeals from the unit manager's response (or non-response, as the case may be) are submitted "to the Warden/Administrator within five (5) days from delivery of the response." § 90-9-5.1. "The Warden/Administrator shall respond to the appeal . . . within five (5) days." § 90-9-5.4. Finally, if the warden's response is unsatisfactory, or if the warden does not respond within the applicable time, the inmate may appeal to the Commissioner of the Division of Corrections within five days of the warden's response or after the applicable time has passed. § 90-9-6.1. The Commissioner is allotted ten days to respond to the appeal. § 90-9-6.3.

Having described the grievance procedure, the next issue is whether the remedies afforded by that procedure were "available" to Plaintiff. In this context, "available" means "capable of use

7

to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (internal quotation marks omitted). *Ross* recognized three situations in which an administrative remedy is not considered "available" to a complaining inmate, including "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. Once the defendant has made a threshold showing of failure to exhaust, the burden of showing that administrative remedies were unavailable falls to the plaintiff. *See Washington v. Rounds*, 223 F. Supp.3d 452, 459 (D. Md. 2016) (citing *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011)). Again, disputed questions of fact are resolved by the Court. *See Lee*, 789 F.3d at 678.

Defendants have met their initial burden to prove that Plaintiff failed to exhaust his administrative remedies in relation to the May and June 2013 incidents. There is simply no record that Plaintiff timely grieved either incident. (Frye Aff. ¶ 9, ECF No. 56-6.) West Virginia regulations require all inmate grievances to be logged upon acceptance, W. Va. Code R. § 90-9-4.3, but the relevant log does not reveal any grievances filed during the months of May or June in relation to the incidents in question. (Frye Aff. ¶ 9.) Nor has Plaintiff produced copies of grievances allegedly submitted during this period. Plaintiff is adamant, however, that he grieved the incidents on time. He concludes that prison officials destroyed his grievances, presumably prior to their consideration by the unit manager. (*See* Objs. at 2.)

Plaintiff has maintained his theory of grievance destruction since at least September and October 2013. The record contains documentary evidence that Plaintiff submitted three grievances, two on September 10, 2013 and one on October 4, 2013, which address the May and June 2013 incidents. In each case, Plaintiff claimed that he had filed initial grievances on time

8

but never received a response from his unit manager. (Compl. Ex. 17–19.) All three grievances were rejected as untimely.

Plaintiff's claim that officers destroyed his grievances may be persistent, but he has continually failed to provide the detail necessary to make it believable. On May 6, 2013, Plaintiff was placed on a Behavior Management Plan ("BMP")—a type of disciplinary segregation—in consequence for the conduct described in Count I of the Complaint. The BMP severely restricts inmate privileges and access to personal property for between three and ten days. Plaintiff provides no reasonable explanation for how he acquired grievances forms and writing instruments while on the BMP. When asked about this at his deposition, Plaintiff incredibly claimed that he procured blank grievance forms and a pen through use of a handheld magnet. (Creel Dep. 36:6–7, 37:12–18, 40:18–41:7, ECF No. 56-11.) Plaintiff attempts to clarify this point in his objections, claiming that his reference to the magnet was meant to be figurative. He now says that his charisma persuaded an inmate janitor to supply the grievance forms. (Objs. at 4.) But this assertion raises more questions than it answers. If grievance forms were off-limits to inmates on a BMP, surely Plaintiff obtaining and submitting the same would have resulted in further disciplinary action. Magnets aside, Plaintiff cannot identify the correctional officers to whom he allegedly submitted the grievances nor, at least as to the June grievance, the date of submission.[1]

Unsubstantiated and conclusory assertions by an inmate that prison officials thwarted pursuit of the administrative process are insufficient to excuse failure to exhaust. *Ferguson v. Clarke*, No. 7:14-cv-00108, 2016 WL 398852, at *6 (W.D. Va. Jan. 5, 2016) (inmate's allegation

---

[1] Plaintiff testified at his deposition that he initially submitted both grievances on May 16, 2013. Because the June 7 incident had not yet occurred, Plaintiff's testimony must be inaccurate. In his objections, Plaintiff asserts that he submitted the May grievance on May 16, 2013 and the grievance responsive to the June 7 altercation sometime during the month of June.

administrative process was unavailable was belied by evidence that inmate submitted other grievances within the same period); *Stohl v. E. Reg'l Jail*, No. 1:14CV109, 2015 WL 5304135, at *7 (N.D. W. Va. Sept. 8, 2015) (inmate's conclusory assertion that prison officials "discarded" grievance forms insufficient to prove unavailability of grievance procedures); *Al Mujahidin v. Harouff*, No. 9-11-2964-MGL, 2013 WL 4500446, at *7 (D.S.C. Aug. 21, 2013) ("Plaintiff is not entitled to avoid summary judgment simply by asserting a conclusory and unsupported allegation that his grievances were destroyed or not processed, particularly in light of the documentary evidence to the contrary."); *McMillian v. N.C. Cent. Prison*, No. 5:10-CT-3037-FL, 2013 WL 1146670, at *5 (E.D.N.C. Mar. 19, 2013) ("[A]llegations that [inmate's] grievances were not accepted by staff, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, are insufficient to refute defendants' arguments in support of their exhaustion defense."), *aff'd*, 534 F. App'x. 221 (4th Cir. 2013); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (same).

On this score, *Veloz* is particularly instructive. Like here, the plaintiff-inmate in *Veloz* claimed that his grievances had been discarded by prison officials. 339 F. Supp. 2d at 516. Also like here, the record contained no evidence that the grievances had ever been submitted. The plaintiff did not name a particular officer involved in thwarting his attempts to file, rather, "he simply contend[ed] that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost." *Id.* at 516. The court held that the inmate's unsupported allegations were insufficient to prove unavailability of the grievance procedure. Bolstering this finding was the conclusion that the inmate should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming." *Id.* (citing

*Martinez v. Williams*, 186 F. Supp. 2d 353, 357 (S.D.N.Y. 2002); *Waters v. Schneider*, No. 01 CIV. 5217(SHS), 2002 WL 727025, at *1 (S.D.N.Y. Apr. 23, 2002)).

In this case, therefore, Plaintiff's claim that correctional officers must have "destroyed" his initial grievances is insufficient to excuse the exhaustion requirement. Even assuming Plaintiff submitted the grievances, he offers no evidence that any particular officer or officers thwarted his efforts to pursue the administrative process. Further, Plaintiff forgets that the grievance procedure allowed him to proceed to the next level of review if his grievances did not receive an initial answer. Plaintiff was obliged to follow this process in order to exhaust, yet he concedes that he did not file an appeal because he "didn't read their policy." (Creel Dep. at 47:23.) Plaintiff did nothing to follow up on the alleged grievances until three and four months later, in September 2013.

Further belying Plaintiff's theory is evidence showing that he successfully submitted at least one grievance during the period he alleges his others were destroyed. On May 16, 2013 and while he remained on the BMP, Plaintiff filed a grievance complaining that his mail was being withheld. (Creel Dep. Ex. 1, ECF No. 56-11.) The unit manager responded on the same date and Plaintiff did not appeal. (*Id.*) Finally, to the extent that Plaintiff argues that correctional officers sought out and destroyed these particular grievances to hide evidence of their misdeeds, the Court is unpersuaded. The altercations between Plaintiff and correctional officers on May 6 and June 7, 2013 were video recorded and made the subject of internal review. (Defs.' Mot. for Summ. J. Ex. A and B; ECF No. 56-1, 2; Video Exhibits, ECF No. 71.) The Court does not doubt that Plaintiff's portrayal of the events differs from that of the officers'. But between the objective

video evidence and the internal investigations already underway, Plaintiff's suggestion that the officers were motivated to destroy his grievance forms is not a reasonable one.

Defendants have demonstrated that Plaintiff did not exhaust his remedies with regard to the May 6 and June 7, 2013 incidents. Plaintiff, in turn, fails to come forward with credible evidence to demonstrate that those remedies were unavailable. All counts of the Complaint touching on the events of these dates—namely, Counts One and Two *en toto* and Counts Four and Five in part—are therefore **DISMISSED WITHOUT PREJUDICE**.

### B. *Due Process Claims*

Count Four of the Complaint alleges "repeated due process violations" arising from the routine deprivation of personal property when placed on the BMP. (Compl. ¶ 40.) Defendants do not address Plaintiff's due process claims in their briefing accompanying the Motion for Summary Judgment. Nevertheless, the Magistrate Judge acted *sua sponte* to recommend dismissal of Count Four for failure to state due process claims.[2] Plaintiff objects. He contends that the confiscation of all of his personal property—including clothing and religious materials— was a punitive measure outside the scope of a correctional officer's authority to impose without procedural safeguards.

Count Four is conspicuously vague and some background will be necessary. The Complaint does not specify when the confiscations giving rise to Count Four allegedly occurred; instead, the Complaint refers to a number of attached grievances. With regard to those grievances,

---

[2] Because Plaintiff has been given ample notice, *sua sponte* consideration of the sufficiency of his due process claim is appropriate. *See Shaheen v. Saoud*, 650 F.App'x. 143, 152 (4th Cir. 2016) ("[T]he court is not required to ignore an obvious failure to allege facts setting forth a plausible claim for relief. In such a circumstance, the court is authorized to dismiss a claim *sua sponte* under [Rule 12(b)(6) ], as long as there is notice and an opportunity to be heard." (citations omitted)).

the Court observes that Plaintiff filed grievances concerning his placement on the BMP and the attendant confiscation of his property on September 30, October 3, and October 23, 2013. On September 30 and October 3, Plaintiff generally complained of the confiscation of his Bible and other religious materials without mentioning the dates of confiscation.[3] (Compl. Ex. 24, 26, ECF No. 1-1 at 28, 30.) Plaintiff claimed that he was deprived of his property for between three and ten days. The grievances were rejected as having been answered on a similar grievance. (*Id.*) On October 23, Plaintiff grieved the confiscation of two oranges found in his cell on the evening of October 15, 2013. To this grievance, Plaintiff's unit manager responded that "[m]aking or attempting to make alcohol is a behavior issue" justifying the revocation of inmate privileges. (Compl. Ex. 25, ECF No. 1-1 at 29.) The unit manager denied the grievance and the warden and commissioner affirmed.

To the extent Plaintiff's grievances regarding the confiscation of property stem from the events of May 6 and June 7, 2013, the Court has previously dismissed the claims for failure to exhaust. Thus, Plaintiff's remaining due process claims relate to the confiscation of property occurring on September 26 and October 15, 2013.[4] Having defined the parameters of Plaintiff's due process claims—as reasonably possible with liberal construction of his pleading—the Court proceeds to consider the sufficiency of Plaintiff's allegations.

The Fourteenth Amendment of the United States Constitution prohibits a State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process claim, a plaintiff must first identify a

---

[3] Based on facts alleged in the Complaint, the Court believes the September 30 and October 3, 2013 grievances relate to the confiscation of Plaintiff's property on May 6, June 7, and September 26, 2013.
[4] There is no dispute that Plaintiff properly grieved and exhausted his complaints with respect to the September 26 and October 15 incidents.

protected liberty or property interest and then demonstrate deprivation of that interest without due process of law." *Martin v.* Duffy, 858 F.3d 239, 253 (4th Cir. 2017) (quoting *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015)) (internal quotation marks and alterations omitted). If no liberty interest is at stake, the Constitution does not require due process and the second prong becomes irrelevant. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The Court begins with this threshold question.

"A liberty interest may arise from the Constitution itself" or "from an expectation or interest created by state laws or policies." *Id.* (citations omitted); *see also Sandin v. Conner*, 515 U.S. 472, 483–84 (1995) ("States may under certain circumstances create liberty interests which are protected by the Due Process Clause." (citation omitted)). The concerns identified by Plaintiff in Count Four do no implicate constitutionally protected interests. As the Supreme Court noted in *Wilkinson*, the Constitution does not create "a liberty interest in avoiding transfer to more adverse conditions of confinement." *Id.* (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)). Temporary suspension of privileges does not implicate a constitutionally protected liberty or property interest either. *See Jardine-Byrne v. Santa Cruz Cty.*, No. 5:16-cv-03253-EJD, 2017 WL 1047027, at *5 (N.D. Cal. Mar. 20, 2017) (temporary suspension of library access did not jeopardize a liberty interest arising from the Constitution).

Without identification of a protected liberty or property interest arising from the Constitution itself, Plaintiff must point to a West Virginia policy or regulation establishing a protected interest. *See Wilkinson*, 545 U.S. at 221–22. This is not the extent of his obligation, however. "[W]hile a state statute or policy may 'create liberty interests' giving rise to Due Process protection, this is so only if the denial of such an interest 'imposes atypical and significant

14

hardship on the inmate in relation to the ordinary incidents of prison life.'" *Prieto v. Clarke*, 780 F.3d 245, 250 (4th Cir. 2015) (quoting *Sandin*, 545 U.S. at 484). Thus, even "[a]fter finding a basis for an interest or expectation in state regulations, an inmate must then demonstrate that denial of this state-created interest resulted in an 'atypical and significant hardship' to him." *Id.* With respect to what remains of Count Four, Plaintiff does neither. That is, he neither identifies a West Virginia policy providing him with an expectation of avoiding the conditions of his confinement, including the temporary restrictions on possession of property, nor alleges facts to suggest that those conditions are harsh and atypical in relation to the ordinary incidents of prison life.

Presumably, the West Virginia Division of Corrections has developed policies concerning the reclassification of inmates to a BMP and the loss of privileges that accompanies the reclassification. Plaintiff does not identify any such policies in his Complaint or accompanying exhibits however. Further, courts that have considered similar factual allegations have held that the temporary deprivation of property due to an inmate's reclassification to a less-privileged status does not present an atypical or significant hardship. *See Samford v. Staples*, 249 F. App'x 1001, 1004 (5th Cir. 2007) (inmate failed to state due process claim by alleging he had "all property confiscated" because he failed to allege facts showing that the removal of his personal items imposed a significant hardship); *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (finding inmate failed to state a due process claim for deprivation of property where the property was withheld as a result of reclassification); *Lanham v. Kirkegard*, No. CV 15-9-H-DLC-JTJ, 2015 WL 1345534, at *5 (D. Mont. Mar. 23, 2015) ("[A] temporary deprivation of property as a result of being reclassified is not an atypical and significant hardship in relation to the ordinary incidents of prison life."). The same is true for the confiscation of contraband. *See Lyon v. Farrier*, 730

F.2d 525, 527 (8th Cir. 1984) (inmate could not "seriously argue" that he had a protected property interest in contraband).

As these cases make clear, prison officials are granted broad discretion in determining the kinds of personal property inmates can possess. Without factual allegations establishing that MOCC's policies with regard to retention of personal property while in disciplinary segregation are so restrictive that they are atypical of similar programs or pose an unusual hardship on inmates, Plaintiff's has not stated plausible due process claims. Count Four is therefore **DISMISSED WITHOUT PREJUDICE**.

   *C.* *Supervisory Liability*

Plaintiff objects to the proposed dismissal of most of his supervisory liability claims. In Count Five, Plaintiff alleges claims against Ballard and Rubenstein for their role in facilitating the wrongs of their correctional officers. Given his findings as to failure to exhaust and the inadequate pleading of the claims for due process, the Magistrate Judge recommended dismissal of all supervisory liability claims stemming from the officer conduct described in Counts One, Two, and Four of the Complaint. The Magistrate Judge found that genuine and material factual issues persisted as to whether Ballard sanctioned his officers' use of force against Plaintiff on September 26, 2013. Denial of summary judgment was recommended in that respect. However, because Rubenstein's alleged role in the September 26 affair was limited to the denying Plaintiff's grievances, the Magistrate Judge found that Rubenstein was entitled to judgment as a matter of law. Plaintiff objects generally to each unfavorable finding.

Given the Court's rulings above, only Plaintiff's objection with regard to Rubenstein's involvement in the September 26 incident need be addressed. Plaintiff does not allege that

Rubenstein was present at or otherwise directly involved in the altercation of September 26, 2013. Instead, he asserts that Rubenstein "failed to property investigate" the matter and that Rubenstein "knew or should have known, in part because of the plaintiff's grievances, of the pervasive and widespread abuse of inmates at MOCC." (Objs. at 13.)

"Supervisors are often one step or more removed from the actual conduct of their subordinates; therefore, the law requires more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Fourth Circuit held that supervisors may be liable for the actions of their subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved, prior constitutional violations. Such liability is based upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* at 798 (quoting *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)). In *Shaw*, the Fourth Circuit discussed the following elements necessary to establish a supervisor's liability under § 1983:

> 1) The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> 2) The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and
>
> 3) There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

*Id.* at 799.

In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court clarified that a prison official's "actual subjective awareness" of an excessive risk of harm or safety was required to hold the official liable under the Eighth Amendment. *Id.* at 837–38. Thus, a prison official cannot be held liable for the failure to alleviate a risk that he should have perceived, but did not in fact perceive. *Id.* at 838.

The conclusory allegations in Plaintiff's Complaint are devoid of facts establishing Rubenstein's "actual subjective awareness" of the misconduct alleged in Count Three. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a plausible claim to relief] . . . While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678–79. Further, Rubenstein's knowledge of Plaintiff's grievance is insufficient to establish supervisory liability. *See Lowe v. Matheney,* 2015 WL 5795867, at *9 (S.D. W. Va. Sept. 30, 2015) (ruling that threadbare allegations regarding a supervisor's role in the denial of grievances are insufficient to state a plausible claim of supervisory liability). Accordingly, the Court **FINDS** that summary judgment is warranted as to all claims against Rubenstein.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's objections are **OVERRULED**. (ECF No. 77.) The Court **ADOPTS** the PF&R, (ECF No. 76), and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (ECF No. 56.) The Court **ORDERS** that Counts One and Two be **DISMISSED** in their entirety. Count Five is **DISMISSED** to the extent it concerns the incidents occurring on May 6, 2013 and June 7, 2013. Count Five is further **DISMISSED** as to Defendant Rubenstein. In all other respects, Defendants' motion is **DENIED**.

Plaintiff's Motion for Summary Judgment is **DENIED**. (ECF No. 60.) Count Four is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim upon which relief can be granted.

This matter will proceed to trial on the claim alleged in Count Three as well as those alleged in Count Five, as pertaining to Defendant Ballard and the incident on September 26, 2013. A scheduling order will follow the entry of this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: September 12, 2017

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE